Paul E. Summit
Andrew T. Solomon
SULLIVAN & WORCESTER LLP
1633 Broadway
New York, NY 10019
(212) 660-3000

*Attorneys for Plaintiff/Judgment Creditor*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

THE EXPORT-IMPORT BANK OF
THE REPUBLIC OF CHINA,

                 Plaintiff/Judgment Creditor,

       -against-

GRENADA,

              Defendant/Judgment Debtor.

------------------------------------------------------------X

Civil Action No: 13-cv-1450


# MEMORANDUM OF LAW IN SUPPORT OF MOTION BY THE EXPORT-IMPORT BANK OF THE REPUBLIC OF CHINA FOR AN ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE, <u>WITH A TEMPORARY RESTRAINING ORDER</u>


SULLIVAN & WORCESTER LLP
   Paul E. Summit
   Andrew T. Solomon
1633 Broadway
New York, NY 10019

*Attorneys for Plaintiff/Judgment Creditor The*
*Export-Import Bank of the Republic of China*

<u>**TABLE OF CONTENTS**</u>

Page

Table of Authorities ............................................................................................................ ii

I.  Introduction .......................................................................................................... 1

II.  Background ............................................................................................................ 5

III.  Argument ............................................................................................................... 8

    A.  Ex-Im Bank is Entitled to a TRO and Preliminary Injunction Prohibiting
    Grenada from Reordering Its Affairs to Evade the Court's Authority and
    Requiring It to Make Proportional Payments to Ex-Im Bank Pending the
    Adjudication of the Complaint ....................................................................... 8

        1.  Ex-Im Bank is Likely to Succeed on the Merits of Its Pari Passu
        Claim ................................................................................................... 8

        2.  Ex-Im Bank Would Suffer Irreparable Harm if Grenada Is
        Permitted to Manipulate Its Payment Procedures and Continue
        Paying Its Other Creditors Without Making Concurrent,
        Proportionately Equal Payments to Ex-Im Bank While the Court
        Adjudicates the Merits of the Complaint ......................................... 10

        3.  The Balance of Equities Decisively Favors Issuing Preliminary
        Relief .................................................................................................. 12

        4.  Issuing Preliminary Relief Would Promote the Public Interest ................ 14

    B.  The Requested Preliminary Relief .................................................................. 15

IV.  Conclusion ........................................................................................................... 18

## TABLE OF AUTHORITIES

Page

Cases

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994) ........................................................................................ 14-15

*Doctor's Associates, Inc. v. Stuart*, 85 F.3d 975 (2d Cir. 1996) .................................... 18

*In re Feit & Drexler, Inc.*, 760 F.2d 406 (2d Cir. 1985) ............................................. 10

*LaForest v. Former Clean Air Holding Company*, 376 F.3d 48 (2d Cir. 2004) ........................ 18

*NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246 (2d Cir. 2012) .............. 3, 4, 9, 10, 11,
12, 13, 14, 15, 16

*NML Capital, Ltd. v. Republic of Argentina*, Nos. 08 Civ. 6978(TPG),
09 Civ. 1707(TPG), 09 Civ. 1708(TPG), 2012 WL 5895650 (S.D.N.Y.
Nov. 21, 2012) ........................................................................................... 16

*NML Capital, Ltd. v. Republic of Argentina*, Nos. 08 Civ. 6978(TPG),
09 Civ. 1707(TPG), 09 Civ. 1708(TPG), 2012 WL 5895786 (S.D.N.Y.
Nov. 21, 2012) ......................................................................................... 15-16

*Pamlab, L.L.C. v. Macoven Pharmaceuticals, L.L.C.*, No. 11 Civ. 9022 TPG JCF,
2012 WL 2540234 (S.D.N.Y. June 29, 2012) ................................................................. 8

*Von Grabe v. Ziff Davis Publishing Company*, No. 91 Civ. 6275 (DLC),
1994 WL 719697 (S.D.N.Y. Dec. 29, 1994) ................................................................. 8

*In re Vuitton Et Fils S.A.*, 606 F.2d 1 (2d Cir. 1979) ............................................. 12

*Wisdom Import Sales Company v. Labatt Brewing Company*, 339 F.3d 101
(2d Cir. 2003) ........................................................................................... 11

Statutes

28 U.S.C. § 1609 ........................................................................................... 10

Rules

Federal Rule of Civil Procedure 65(b)(2) ................................................................. 18

Federal Rule of Civil Procedure 65(d)(1) .................................................................. 1

## Court Documents

*Export-Import Bank of the Republic of China v. Grenada,*
   No. 06-CV-02469-HB (S.D.N.Y.), ECF No. 15 ................................................ 1, 4

*Export-Import Bank of the Republic of China v. Grenada*, 06-CV-2469(HB)(AJP)
   (S.D.N.Y.), ECF No. 23 ................................................................................ 13

*Export-Import Bank of the Republic of China v. Grenada*, 06-CV-2469(HB)(AJP)
   (S.D.N.Y.), ECF No. 59 ................................................................................ 13

*NML Capital, Ltd. v. Republic of Argentina*, No. 12-105(L) (2d Cir.),
   ECF No. 490 ................................................................................................ 16

*NML Capital, Ltd. v. Republic of Argentina*, No. 12-105(L) (2d Cir.),
   ECF No. 903 ................................................................................................ 16

*NML Capital, Limited v. Republic of Argentina*, Nos. 08 Civ. 6978 (TPG),
   09 Civ. 1707 (TPG), 09 Civ. 1708 (TPG) (S.D.N.Y.), ECF No. 355 ...................... 4

*NML Capital, Limited v. Republic of Argentina*, Nos. 08 Civ. 6978 (TPG),
   09 Civ. 1707 (TPG), 09 Civ. 1708 (TPG) (S.D.N.Y.), ECF No. 371 ............... 4, 11-12, 15, 16

In 2007, the District Court awarded The Export-Import Bank of The Republic of China ("Ex-Im Bank") a judgment against Grenada in connection with Grenada's default on four multi-million dollar promissory notes. That judgment is wholly unpaid. Ex-Im Bank now moves in this new action for a temporary restraining order ("TRO") and preliminary injunction under Federal Rule of Civil Procedure 65(d)(1) immediately restraining Grenada from altering or amending the processes or specific transfer mechanisms by which it makes payments in connection with its other external debt; (2) immediately prohibiting Grenada from making payments to its other external debtholders without making concurrent, proportionately equal payments to Ex-Im Bank; and (3) directing Grenada to appear to show cause why a preliminary injunction should not issue.

## I.   Introduction

On March 16, 2007, in the earlier action between the parties, *Export-Import Bank of the Republic of China v. Grenada*, No. 06-CV-2469(HB)(AJP) (S.D.N.Y.) ("Action One"), this Court entered an amended judgment (ECF No. 15) in favor of Ex-Im Bank and against Grenada in the amount of $21,586,057.38, plus pre-judgment interest, attorney's fees and post-judgment statutory interest, arising from Grenada's default on four multi-million dollar promissory notes executed by Grenada in favor of Ex-Im Bank from July 27, 1990 to January 21, 2000. *See* Summit Decl., Exh. A at 1. With post-judgment interest, Ex-Im Bank's judgment against Grenada now stands in excess of $32,000,000. Almost six years after judgment, Grenada has still not paid anything to Ex-Im Bank in satisfaction.

Contemporaneous with the execution of the four promissory notes, Ex-Im Bank and Grenada also executed four loan agreements that governed Grenada's borrowing of money from Ex-Im Bank (the "Loan Agreements"). The Loan Agreements each contain *pari passu* clauses. Section 4.04 of the Loan Agreement of April 24, 1997, for example, states:

{B1533023; 17}                                           1

> Borrower's obligations under this Agreement and the Note will at all times rank at least <u>pari passu</u> with Borrower's any other External Indebtedness (direct or contingent) outstanding from time to time.

*See* Summit Decl., Exh. B at 9.  The Loan Agreements define "External Indebtedness" as debt denominated in a currency other than Grenada's, and payable to a nonresident of Grenada.  *See* Summit Decl., Exh. B at 2; Exh. C at 2-3; Exh. D at 3; Exh. E at 2.  The other three loans have identical or materially identical *pari passu* clauses.[1]

The Loan Agreements also contain a negative covenant given by Grenada that prohibit Grenada from giving any kind of preference, including a payment preference, in favor of any other creditor until all amounts payable under the Loan Agreements to Ex-Im Bank are paid in full.  *See* Summit Decl., Exh. B at 10; Exh. C. at 11-12; Exh. E. at 12.

Grenada has routinely violated these promises.  For years, Grenada has made payments on other "External Indebtedness" (*see* Summit Decl., Exh. F at 49-50), including a recent full interest payment to holders of a bond (*see* Summit Decl., Exh. G at 1; Exh. H at 1), while making no payments to Ex-Im Bank.[2]  Indeed, Grenada's intention not to pay bondholders who did not restructure, Ex-Im Bank included, is explicitly disclosed in the Offering Memorandum (*see* Summit Decl., Exh. L at 18) in express violation of the negative covenants given to Ex-Im Bank in the Loan Agreements.

Ex-Im Bank has now filed a complaint seeking specific enforcement of the *pari passu* clauses contained in the Loan Agreements (the "<u>Complaint</u>") and the negative covenant against

---

[1] The Loan Agreement of October 1, 1997 has identical language.  *See* Summit Decl., Exh. C at 10, Section 4.04.  The other two Loan Agreements (section 5.04 of the Loan Agreement of July 27, 1990, and section 5.01(d) of the Loan Agreement of January 21, 2000) have materially identical *pari passu* clauses.  *See* Summit Decl., Exh. D at 12; Exh. E at 10.

[2] There are three types of debt arrangements that arise in discussion of Grenada's External Indebtedness: (1) commercial debt; (2) bilateral debt (owned by individual sovereign nations); and (3) multilateral debt (owned by the IMF and the World Bank).  The first two categories are relevant to Ex-Im Bank's rights under the *pari passu* clauses; the third (for reasons explained *infra*) is not.

making preferential payment arrangements with other creditors for the payment of principal and interest.[3]   Ex-Im Bank seeks a preliminary order that would forbid Grenada from altering its existing procedures for making payments on its other External Indebtedness to escape the jurisdictional reach of this Court; and that would require Grenada to rank its payment obligations to Ex-Im Bank at least equally with its payment obligations to its other external creditors, until the Court can fully adjudicate Ex-Im Bank's claims related to Grenada's violation of the *pari passu* clauses and the negative covenants.

Recently, the Second Circuit issued a landmark ruling on all fours with this case.  *NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246 (2d Cir. 2012).  There, NML Capital, Ltd. ("NML") was attempting to recover principal and interest due on bonds issued by Argentina, which had also bound itself to a *pari passu* clause virtually identical to those here.  The relevant portion of the *pari passu* clause in *NML* stated:

> [t]he Securities . . . shall at all times rank pari passu without any preference among themselves.  The payment obligations of the Republic under the Securities shall at all times rank at least equally with all its other present and future unsecured and unsubordinated External Indebtedness . . .

*Id.* at 250 (internal citations and emphasis omitted).

Like Grenada, Argentina had restructured its external debt, and had announced that it would not make payment on any bonds that were eligible to participate in the exchange offer, but did not participate.  *Id.* at 252-53.  Thus, like Grenada, Argentina was servicing its restructured debt, while making no payments on plaintiff NML's bonds.  *Id.* at 253.

In response to Argentina's violations of the *pari passu* clause, NML sought the same equitable relief that Ex-Im Bank seeks here.  NML initially requested and was granted a TRO

---

[3] The Loan Agreements are contracts in which Grenada made promises to Ex-Im Bank distinct from those made in the promissory notes, including the promise to rank all debt to Ex-Im Bank (including the indebtedness related to judgment) at least equally with its other external debt.  It is these additional promises of rank, rather than money, that form the basis of this Complaint seeking equitable relief.

that prohibited Argentina from altering or amending the processes or specific transfer mechanisms by which it made payments on its other external debt.[4] It then sought permanent relief in the form of an order of specific performance prohibiting Argentina from making payments to its other external debtholders without making concurrent, proportionately equal payments to NML. *NML*, 699 F.3d at 254. The District Court granted NML all of the equitable relief sought.[5] Significantly, the District Court's order reached banks and other agents that were assisting Argentina in the payment of its external debt by prohibiting those banks and agents from

> aiding and abetting any violation of [the order], including any further violation by [Argentina] of its obligations under [the *pari passu* clause], such as any effort to make payments under the terms of the Exchange Bonds without also concurrently or in advance making a Ratable Payment to [NML].

2/23/2012 Order, at 5, *NML Capital, Ltd. v. Republic of Argentina*, Nos. 08 Civ. 6978 (TPG), etc., (S.D.N.Y.), ECF No. 371.

The Second Circuit unanimously affirmed, noting that it had "little difficulty" concluding that Argentina had breached the *pari passu* clause (*NML*, 699 F.3d at 260); and that the equitable relief that the District Court had earlier entered was permitted by law and amply justified ("disregard of [Argentina's] legal obligations exceeds any affront to its sovereign powers resulting from [the District Court's orders]"). *Id.* at 263. While it affirmed the substantive provisions of the District Court's orders entirely, the Second Circuit also remanded for clarification on certain issues pertaining to how the injunctions are to function. *Id.* at 250-51, 264-65. These issues, and the present status of *NML*, are discussed further *infra*.

---

[4] 1/5/2012 Order to Show Cause Why a Preliminary Injunction Should Not Issue, with Temporary Restraining Order, *NML Capital, Ltd. v. Republic of Argentina*, Nos. 08 Civ. 6978 (TPG), 09 Civ. 1707 (TPG), 09 Civ. 1708 (TPG) (S.D.N.Y.), ECF No. 355.

[5] 2/23/2012 Order, at 3-5, *NML Capital, Ltd. v. Republic of Argentina*, Nos. 08 Civ. 6978 (TPG), 09 Civ. 1707 (TPG), 09 Civ. 1708 (TPG) (S.D.N.Y.), ECF No. 371.

## II.  Background

Grenada has never disclosed its arrangements with its other external creditors to Ex-Im Bank, but there is public information about those arrangements.

After Hurricane Ivan hit Grenada on September 7, 2004, Grenada retained Bear Stearns & Co., Inc. ("Bear Stearns") to assist in the restructuring of its debt. *See* Summit Decl., Exh. I at 228.[6] Bear Stearns advised Grenada that bonds, loans, guarantees of private sector obligations, bank overdrafts, and bilateral credits should be deemed eligible to participate in the restructuring. *See* Summit Decl., Exh. I at 228.

One year after the hurricane, on September 9, 2005, Grenada made an offer to its commercial creditors to settle outstanding claims. *See* Summit Decl., Exh. I at 228. The restructuring offer to holders of eligible commercial debt included holders of approximately $190,000,000 of external debt. *See* Summit Decl., Exh. K at 14. The restructuring offer proposed an exchange of the eligible external debt for twenty-year US dollar-denominated bonds. *See* Summit Decl., Exh. I at 228. New York law was the dominant governing law for the restructuring. *See* Summit Decl., Exh. J at 46. Overall, approximately ninety-seven percent of Grenada's external debt restructured. *See* Summit Decl., Exh. J at 25.

As for how to treat creditors that elected not to participate in the restructuring, Grenada stated plainly in its Offering Memorandum for the exchange that

> Grenada *does not intend to pay* any non-tendered Eligible Claims [that is, debt that elected not to restructure] unless resources become available to do so. In addition, Grenada *does not intend to pay* any amount in respect of a non-tendered Eligible Claim if, at the time such payment is due, a payment default then exists under any New Bond [that is, any new bond issued in the exchange].

*See* Summit Decl., Exh. L at 18 (emphasis added).

---

[6] Bear Stearns' duties in connection with the restricted debt are, on information and belief, currently handled by J.P. Morgan Chase.

Ex-Im Bank chose not to seek to participate in the restructuring.  As a result, it was condemned to default by Grenada (*pari passu* clauses notwithstanding).

Bilateral creditors were approached separately in 2006 through means of the Paris Club with a request for equivalent debt relief.  *See* Summit Decl., Exh. I at 229.[7]  That led to the rescheduling of obligations to Grenada's various bilateral creditors (Belgium, the United Kingdom, the United States, and France), *see* Summit Decl., Exh. F at 18, affecting approximately $16,000,000 of External Indebtedness.  *See* Summit Decl., Exh. J at 103.

In connection with the 2005 and the Paris Club restructurings, Grenada has been making substantial interest payments on its external debt for years, in preference to its obligations to Ex-Im Bank, to the tune of over $43,000,000 (approximately $8,242,000 in 2008, $11,429,000 in 2009, $11,478,000 in 2010, and $12,443,000 in 2011).  *See* Summit Decl., Exh. F at 49 (values converted from East Caribbean dollars to United States dollars).  As recently as October, 2012, Grenada sent a full interest payment to the holders of a $193,000,000 bond arising from the 2005 debt restructuring.  *See* Summit Decl., Exh. G at 1; Exh. H at 1; Exh. L at 6.  At least a portion of these payments are being made through Grenada's paying agent, the Bank of New York Mellon ("BNY Mellon") (global headquarters at One Wall Street, New York, NY).[8]

All the while, Grenada has not paid Ex-Im Bank anything.

Though Grenada has always claimed financial hardship over the course of its litigation with Ex-Im Bank, it painted quite a different picture in a prospectus for the refinancing of Grenada treasury bills in November 2012.  In that prospectus, Grenada claimed that it "has

---

[7] The Paris Club is an informal group of bilateral creditor countries which negotiate collectively with debtor countries.  *See* Summit Decl., Exh. M at 1.

[8] On October 12, 2012, the Government of Grenada announced on its website that it had "advised noteholders today that it has completed payment of the semi-annual September coupon of its US Dollar 2025 Bond through its Paying Agent.  Having made this payment within the grace period, Grenada has not defaulted on the 2025 Bond.  On September 12, 2012, the Government of Grenada issued a Notice to Noteholders of its US Dollar 2025 Bond through its Paying Agent, BNY Mellon...."  *See* Summit Decl., Exh. H at 1.

witnessed a remarkable recovery" since Hurricanes Ivan and Emily in 2004 and 2005. *See* Summit Decl., Exh. F at 18. It also highlighted its commercial debt and Paris club restructurings, its years-long participation in IMF economic reform programs, and its establishment of a Debt Management Unit within its Ministry of Finance. *See* Summit Decl, Exh. F at 18-19. Grenada even went so far as to say that it "has an exemplary record" of repaying all issues of treasury bills since Grenada's entry into that market. *See* Summit Decl., Exh. F at 19.

The instant motion for preliminary relief requests the same temporary prohibition on Grenada's ability to restructure its payment streams that NML sought and was granted under virtually identical circumstances. Ex-Im Bank is also asking the Court to grant Ex-Im Bank further temporary relief in the form of an order immediately requiring Grenada to make the same proportional payments which the Second Circuit has already ordered Argentina to pay. Ultimately, Ex-Im Bank is also requesting the same permanent relief that this court (Griesa, D.J.) granted NML.

The key to *effective* relief is that any order issued by the Court reach the banks and other agents that are within this Court's jurisdiction, and that are working with Grenada in connection with the payment of its External Indebtedness. BNY Mellon is one such bank; JP Morgan Chase is another; there may well be others. However, once advised of the Complaint, Grenada may attempt to restructure its present payment practices to utilize banks and other agents outside this Court's jurisdiction. That is why preliminary relief is needed. Furthermore, since Grenada already owes Ex-Im Bank over $32,000,000, Ex-Im Bank's request that Grenada also be preliminarily required to comply with the proportional payments the Second Circuit has already deemed appropriate is more than fair.

{B1533023; 17}

7

III.   <u>Argument</u>

     *NML* controls here on the fundamental issue of the appropriateness of the temporary relief Ex-Im Bank seeks.  However, Ex-Im Bank will briefly review the reasoning that supports the *NML* outcome, and anticipate some of the arguments that Grenada may attempt to raise in opposition.

     **A.**     **Ex-Im Bank is Entitled to a TRO and Preliminary Injunction Prohibiting Grenada from Reordering Its Affairs to Evade the Court's Authority and Requiring It to Make Proportional Payments to Ex-Im Bank Pending the Adjudication of the Complaint**

     Courts weigh four factors in deciding whether to grant a TRO or preliminary injunction: (1) the likelihood of the movant's success on the merits; (2) the risk of irreparable harm absent equitable relief; (3) the balance of the equities; and (4) the public interest.  *See Pamlab, L.L.C. v. Macoven Pharm., L.L.C.*, 881 F. Supp. 2d 470, 475 (S.D.N.Y. 2012); *see also Von Grabe v. Ziff Davis Publ'g Co.*, No. 91 Civ. 6275 (DLC), 1994 WL 719697, at *1-2 (S.D.N.Y. Dec. 29, 1994) (same standard for granting TROs and preliminary injunctions).  All four factors weigh strongly in favor of granting preliminary relief in this case.

     **1.**     **Ex-Im Bank is Likely to Succeed on the Merits of Its *Pari Passu* Claim**

     In its Complaint, Ex-Im Bank demonstrates that Grenada breached the *pari passu* clauses (and the supporting negative covenants) of the Loan Agreements and should be enjoined from further breaches by an order of specific performance.  In Action One, this Court has already determined that Grenada now owes Ex-Im Bank over $32,000,000.  Under the plain language of the Loan Agreements and existing Second Circuit precedent, Ex-Im Bank will succeed in obtaining not only a judgment declaring that Grenada is breaching the *pari passu* clauses, but also an order prohibiting Grenada from restructuring its payments streams and from making

payments to its other external debtholders without making concurrent, proportionately equal payments to Ex-Im Bank.

That Ex-Im Bank will succeed on the merits of its breach of contract claim is beyond cavil. This Court has already found that the Loan Agreements are valid and binding obligations of Grenada, and that they contain broad waivers of Grenada's sovereign immunity. The Loan Agreements contain *pari passu* clauses substantially identical to those at issue in *NML*. They also contain negative covenants that preclude preferring other creditors over Ex-Im Bank. Those clauses impose a continuing obligation on Grenada with respect to all "Indebtedness" owed from Grenada to Ex-Im Bank, which is defined broadly to cover the Notes and the Judgments. Since the issuance of the Judgments, each payment by Grenada of its External Indebtedness, without paying an equal proportional amount to Ex-Im Bank, constituted a material breach of the Loan Agreements.

As explained further *infra*, only equitable relief can restore Ex-Im Bank's right to equal treatment. Failure to obtain a specific enforcement order that would force Grenada to uphold this promise would subject Ex-Im Bank to irreparable harm because Ex-Im Bank would lose its bargained-for position among Grenada's other creditors. That harm cannot be remedied with a money judgment.

Furthermore, this Court has the ability to order specific performance for Grenada's breach of the *pari passu* clauses and negative covenants in accordance with the request in Ex-Im Bank's Complaint. As the Second Circuit held in *NML*, under New York law, "the absence of the parties' express intention in [an agreement] to restrict the remedies available for breach of the agreement means that the full panoply of appropriate remedies remains available." *NML*, 699 F.3d 246, 262 (2d Cir. 2012) (internal citations omitted). Since none of the Loan Agreements

contain any intention to restrict available remedies, the Court can order the specific performance requested in the Complaint.

Additionally, the specific relief that the Complaint requests complies with the Foreign Sovereign Immunities Act ("FSIA"). It does not attach property of a foreign state in the United States, as is sometimes prohibited in the FSIA. 28 U.S.C. § 1609. In *NML*, the Second Circuit held that the injunctions did not

> attach, arrest, or execute upon any property. They direct Argentina to comply with its contractual obligations not to alter the rank of its payment obligations. They affect Argentina's property only incidentally to the extent that the order prohibits Argentina from transferring money to some bondholders and not others. The Injunctions can be complied with without the court's ever exercising dominion over sovereign property. For example, Argentina can pay all amounts owed to its exchange bondholders provided it does the same for its defaulted bondholders. Or it can decide to make partial payments to its exchange bondholders as long as it pays a proportionate amount to holders of the defaulted bonds. Neither of these options would violate the Injunctions. The Injunctions do not require Argentina to pay any bondholder any amount of money; nor do they limit the other uses to which Argentina may put its fiscal reserves. In other words, the Injunctions do not transfer any dominion or control over sovereign property to the court. Accordingly, the district court's Injunctions do not violate § 1609.

*NML*, 699 F.3d at 262-63.

For all of these reasons, Ex-Im Bank is more than likely to succeed on the merits of its claim.

> ### 2. Ex-Im Bank Would Suffer Irreparable Harm if Grenada Is Permitted to Manipulate Its Payment Procedures and Continue Paying Its Other Creditors Without Making Concurrent, Proportionately Equal Payments to Ex-Im Bank While the Court Adjudicates the Merits of the Complaint

Preliminary relief is appropriate where failure to issue such relief could undermine a court's ability ultimately to grant effective relief on the merits of the claim. *In re Feit & Drexler, Inc.*, 760 F.2d 406, 416 (2d Cir. 1985).

{B1533023; 17}

Ex-Im Bank will suffer irreparable harm if the Court does not immediately prevent Grenada from amending its payment structures on its other external debt. In affirming the District Court's grant of equitable relief in *NML*, the Second Circuit held that Argentina employed "persistent efforts to frustrate the collection of money judgments." *NML*, 699 F.3d at 262. Grenada, too, has persistently refused in the past to honor this Court's order to pay Ex-Im Bank, and in the same way can be expected in the absence of provisional relief to attempt to reorder its affairs to employ agents that are beyond the Court's jurisdiction. Because the key to effective relief is to reach banks working with Grenada in connection with the payment of its external debt that are within this Court's jurisdiction, such a restructuring by Grenada would impair the Court's ability to craft effective equitable relief to prevent further breaches of the *pari passu* clauses and negative covenants by Grenada. A restructuring would also greatly diminish the Court's ability to supervise Grenada's compliance with such an order. The Court accordingly should enter a TRO and preliminary injunction to protect its jurisdiction to provide Ex-Im Bank with effective equitable relief.

Ex-Im Bank will also suffer irreparable harm if the Court does not require Grenada to immediately begin making concurrent, proportionately equal payments to Ex-Im Bank when it makes payments on its other external debt. The Second Circuit has defined "irreparable harm" as "certain and imminent harm for which a monetary award does not adequately compensate." *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co.*, 339 F.3d 101, 113 (2d Cir. 2003). In ordering the same equitable relief in *NML*, the District Court held that

> [a]bsent equitable relief, [plaintiff] would suffer irreparable harm because the Republic's payment obligations to [plaintiff] would remain debased of their contractually-guaranteed status, and [plaintiff] would never be restored to the position it was promised that it would hold relative to other creditors in the event of default.

{B1533023; 17}

11

2/23/2012 Order, at 2, *NML Capital, Ltd. v. Republic of Argentina*, Nos. 08 Civ. 6978 (TPG),

09 Civ. 1707 (TPG), 09 Civ. 1708 (TPG) (S.D.N.Y.), ECF No. 371.

In the same way, Grenada will suffer irreparable harm without the TRO and preliminary

injunction because no amount of monetary payment or specific enforcement order in the future

will be able to compensate Ex-Im Bank for Grenada's disregard, during this time period, of the

*particular position* Grenada promised Ex-Im Bank that it would have in relation to Grenada's

other external indebtedness.  In other words, Grenada promised that Ex-Im Bank would receive a

guaranteed share of any money that Grenada put towards its external debt.  Each time Grenada

makes payments on its other external debt without making concurrent, proportionately equal

payments to Ex-Im Bank, Ex-Im Bank is harmed in a way for which it can never be

compensated.  As such, Ex-Im Bank will suffer irreparable harm if the Court does not order the

TRO and preliminary injunction.

### 3.    The Balance of Equities Decisively Favors Issuing Preliminary Relief

The balance of equities overwhelmingly favors the granting of Ex-Im Bank's request for

a TRO and preliminary injunction.  No equitable considerations weigh against preliminarily

prohibiting Grenada from amending its payment structures on its other external debt.  The only

reason Grenada possibly could oppose such interim relief is if it intends to obstruct the Court's

jurisdiction through evasive action.  Any intended scheme to undermine the Court's authority is

not entitled to any equitable weight.  Indeed, the possibility that a party may take preemptive

action to thwart a court's ability to grant effective relief is often the principal basis for issuing a

TRO.  *See In re Vuitton Et Fils S.A.*, 606 F.2d 1, 4 (2d Cir. 1979) (per curiam).

The balance of equities also decisively favors the granting of the preliminary relief

sought that would prohibit Grenada from making payments to its other external debtholders

without making concurrent, proportionately equal payments to Ex-Im Bank.  Without such a

{B1533023; 17}

12

remedy, Ex-Im Bank will continue to be deprived of the benefit of its bargain: that is, enjoying equal status with Grenada's other external debt. This harm would be irreparable, since Ex-Im Bank has no other available means to enforce its rights under the *pari passu* clauses absent the specific performance it requests of the Court.

When presented with the same issue in *NML*, the Second Circuit held that

> [t]he balance of equities tipped in plaintiffs' favor because of (1) Argentina's "unprecedented, systematic scheme of making payments on other external indebtedness, after repudiating its payment obligations to Plaintiffs, in direct violation of" the Equal Treatment Provision [that is, the provision containing the *pari passu* clause] and (2) Argentina's ability to "violate [that Provision] with impunity" in the absence of injunctive relief.

699 F.3d at 255-56, 263 (internal citations omitted).

Here, Grenada has steadfastly refused to make *any* payments to Ex-Im Bank, while making numerous and substantial payments to its other external creditors.[9] Without the preliminary relief, Grenada has the ability to continue to breach its obligations under the *pari passu* clauses and negative covenants for the duration of the adjudication of the Complaint. Therefore, it is equitable for the Court to grant Ex-Im Bank's motion for preliminary enforcement of the *pari passu* clauses and the negative covenants against granting other creditors payment preferences over Ex-Im Bank.

---

[9] It has also behaved in an often cavalier and reckless fashion in regard to its duties to this Court under the Federal Rules of Civil Procedure, and this Court's orders, in connection with Action One. Grenada has, on numerous occasions, failed to respond to lawful post-judgment discovery requests, or "complied" at a snail's pace. We shall not detail here these episodes, which are familiar to the Court and well-illustrated in prior pleadings and memoranda in Action One. To cite just one example, however: The only payment Grenada has made to Ex-Im Bank since the Judgment was issued is $10,000 in attorney's fees. The District Court ordered Grenada to pay that sum on April 8, 2009, as a sanction for forcing needless motion practice. 4/09/2009 Amended Order (signed 4/08/2009), at 2, *Export-Import Bank of the Republic of China v. Grenada*, 06-CV-2469(HB)(AJP) (S.D.N.Y.), ECF No. 23. For over two years, Grenada failed to pay. The District Court reiterated its order on August 10, 2011. 8/16/2011 Official Transcript of Proceedings of 8/10/2011 Conference, at 49-50, *Export-Import Bank of the Republic of China v. Grenada*, 06-CV-2469(HB)(AJP) (S.D.N.Y.), ECF No. 59. Two-and-a-half years after the District Court's order, on September 22, 2011, Grenada finally paid the sanction to Ex-Im Bank.

4.     Issuing Preliminary Relief Would Promote the Public Interest

Granting the preliminary relief requested would promote the public interest by protecting this Court's jurisdiction while it completes its adjudication of the allegations of Ex-Im Bank's Complaint that Grenada  breached the *pari passu* clauses and negative covenants of the Loan Agreements.  The public interest is ill-served when a party is permitted to exploit a Court's thoughtful deliberations as a window for rearranging its affairs to evade the effects of those deliberations.

Granting the preliminary relief will also serve the twin public interests of enforcing agreements and upholding the rule of law.  It is irrefutable that the enforcement of contractual duties is in the public interest.  *See NML*, 699 F.3d at 256 ("No less than any other entity entering into a commercial transaction, there is a strong public interest in holding the Republic to its contractual obligations." (internal quotation marks and citation omitted)).

Furthermore, it is in the public interest for creditors to have the assurance that they can rely on U.S. courts to enforce their debt instruments and debtors' promises to hold their debt obligations on equal footing with that of other creditors.  In *NML*, the Second Circuit explained that this is particularly important in the case of foreign sovereign debtors:

> [w]hen sovereigns default they do not enter bankruptcy proceedings where the legal rank of debt determines the order in which creditors will be paid.  Instead, sovereigns can choose for themselves the order in which creditors will be paid.  In this context, the Equal Treatment Provision prevents Argentina as payor from discriminating against the FAA Bonds in favor of other unsubordinated, foreign bonds.

*Id.* at 259.

Creditors entering the international public debt market must have confidence that their contractual rights will be enforced.  *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 188 (1994) (noting the importance of adopting rules that foster

"certainty and predictability" in the credit markets). There is simply no question that the public interest warrants the preliminary relief sought here.

The preliminary relief Ex-Im Bank seeks would promote the public interest and provide the legal incentive for Grenada to finally begin upholding its contractual obligations to Ex-Im Bank while the Court fully adjudicates the allegations of the Complaint.

### B.    The Requested Preliminary Relief

In *NML*, the District Court ordered specific enforcement of the *pari passu* clause and the negative covenants in the form of an order prohibiting Argentina from making payments to its other external debtholders without making concurrent, proportionately equal payments to NML. 2/23/2012 Order, at 3-5, *NML Capital, Ltd. v. Republic of Argentina*, Nos. 08 Civ. 6978 (TPG), 09 Civ. 1707 (TPG), 09 Civ. 1708 (TPG) (S.D.N.Y.), ECF No. 371.

As noted above, the Second Circuit unanimously and emphatically affirmed that Argentina had violated the *pari passu* clauses; that NML was entitled to relief; and that equitable relief was the appropriate remedy. However, it remanded to the District Court for clarification on "precisely how [the Ratable Payment] formula is intended to operate." *NML*, 699 F.3d 246, 255 (2d Cir. 2012). The Second Circuit noted that there were two possible interpretations of the order's formula:

> [I]t could be read to mean that if, for example, Argentina owed the holders of restructured debt $100,000 in interest and paid 100% of that amount then it would be required to pay the plaintiffs 100% of the accelerated principal and all accrued interest. Or it could be read to mean that, if such a $100,000 payment to the exchange bondholders represented 1% of the principal and interest outstanding on the restructured debt, then Argentina must pay plaintiffs 1% of the amount owed to them.

*Id.* at 255. On remand, the District Court clarified its order as follows:

> [a]ssuming that Argentina pays 100% of what is then due on the Exchange Bonds . . . . [it] would be required to pay 100% multiplied by the *total amount currently*

*due* to plaintiffs [which consists of] the unpaid principal, the due date of which has been accelerated, and accrued interest.

*NML Capital, Ltd. v. Republic of Argentina*, Nos. 08 Civ. 6978(TPG), 09 Civ. 1707(TPG), 09 Civ. 1708(TPG), 2012 WL 5895786, at *2 (S.D.N.Y. Nov. 21, 2012) (emphasis in the original; internal quotation marks omitted).[10]

On remand, the District Court also vacated its earlier stay on the application of the injunction. *NML Capital, Ltd. v. Republic of Argentina*, Nos. 08 Civ. 6978(TPG), 09 Civ. 1707(TPG), 09 Civ. 1708(TPG), 2012 WL 5895650, at *2 (S.D.N.Y. Nov. 21, 2012). However, the Second Circuit then stayed all of the District Court's orders entered in relation to the matter pending further order of the Second Circuit. 11/28/2012 Order, *NML Capital, Ltd. v. Republic of Argentina*, No. 12-105(L) (2d Cir.), ECF No. 490. The Second Circuit also ordered an expedited briefing schedule, with all briefing to be completed by February 1, 2013. Oral argument took place on February 27, 2013. *Id.*

On Friday, March 1, 2013, the Second Circuit issued a ruling noting that, in the oral argument, Argentina had "appeared to propose" a different formula for re-paying NML's debt; but that the parameters of such a formula were unclear. 3/1/2013 Order, at 1, *NML Capital, Ltd. v. Republic of Argentina*, No. 12-105(L) (2d Cir.), ECF No. 903. It granted until March 29, 2013 to make such a proposal. *Id.* What this means practically is that, while the Second Circuit has affirmatively held that NML is entitled to equitable relief for Argentina's breach of its *pari passu*

---

[10] The District Court had also employed language in its original order that arguably applied the order to intermediary banks. 2/23/2012 Order, at 4-5, *NML Capital, Ltd. v. Republic of Argentina*, Nos. 08 Civ. 6978 (TPG), etc., (S.D.N.Y.), ECF No. 371. As to that issue, the Second Circuit noted that "[u]nder Article 4-A of the U.C.C., intermediary banks, which have no obligations to any party with whom they do not deal directly, are not subject to injunctions relating to payment orders." *NML*, 699 F.3d at 264 (internal citation omitted). It further noted uncertainty as to how the order would generally apply to third parties. *Id.* On remand, the District Court clarified that, while the order reaches third parties that assist Argentina in making payments to its other external debtholders, that reach did not extend to intermediary banks, which are excepted by Article 4A of the U.C.C., or the financial institutions that receive the deposited funds and then transfer them to their customers who are the beneficial interest holders of the bonds at issue. *NML*, 2012 WL 5895786, at *5. The proposed Order To Show Cause submitted here does not purport to reach intermediary banks.

clauses, including proportional payments, it has not yet ruled on the interpretation of the "Ratable Payment" formula.

The preliminary relief Ex-Im Bank requests now tracks the more modest of the two interpretations of the "Ratable Payment" formula set forth by the Second Circuit.  The preliminary relief sought would prohibit Grenada from making payments to its other external debtholders without making concurrent, proportionately equal payments to Ex-Im Bank.  That "Ratable Payment" would be an amount equal to the "Payment Percentage" multiplied by the total amount currently due to Ex-Im Bank.  [Proposed] Order to Show Cause at 2.  The "Payment Percentage" would be calculated by dividing the amount concurrently paid or which Grenada intends to pay an external creditor by the total amount due to that external creditor.  *Id.*  What this would mean practically is that, if Grenada made (or intended) a $100,000 payment to another external creditor at a particular time, and that payment represented 1% of the principal and interest outstanding to that creditor, then Grenada would have to pay Ex-Im Bank 1% of the total amount owed to it, as well.[11]

This is only what was promised to Ex-Im Bank in the Loan Agreements:  that is, that Grenada's obligations under the Loan Agreements would "rank at least *pari passu*" with other external indebtedness.  The four Loan Agreements require nothing less.  For these reasons, the preliminary relief that Ex-Im Bank seeks would prevent Grenada from evading any future Court

---

[11] Ex-Im Bank reserves its rights, of course, to seek injunctive relief requiring Grenada to comply with the alternate "Ratable Payment" formula (the formula that the District Court has ordered, and the Second Circuit has stayed), should the Second Circuit rule that that is the appropriate formula.  In that scenario, if Grenada owed a holder of its other external debt $100,000 at a given time and paid 100% of that amount, then it would be required to pay Ex-Im Bank 100% of the accelerated principal and all accrued interest due to Ex-Im Bank.

order and from continuing to breach the *pari passu* clauses while the Court adjudicates Ex-Im

Bank's Complaint.[12]

## IV.   Conclusion

For the foregoing reasons, the Court should grant an order (1) immediately restraining

Grenada from altering or amending the processes or specific transfer mechanisms by which it

makes payments under its other external debt; (2) immediately prohibiting Grenada from making

payments to its other external debtholders without making concurrent, proportionately equal

payments to Ex-Im Bank; and (3) directing Grenada to appear to show cause why a preliminary

injunction should not issue.  Ex-Im Bank requests a hearing on these issues within 14 days.  *See*

Fed. R. Civ. P. 65(b)(2).

Dated: New York, New York
      March 5, 2013

SULLIVAN & WORCESTER LLP


By: _____
    Paul E. Summit
    Andrew T. Solomon
    1633 Broadway
    New York, NY 10019
    T. 212.660.3000
    F. 212.660.3001

*Attorneys for Plaintiff/Judgment Creditor The Export-Import Bank of the Republic of China*

---

[12] Due to certain internal procedures associated with Ex-Im Bank's status as a state-owned Bank, Ex-Im Bank would not be able to provide a bond within the rapid time frame of the issuance of the temporary relief sought. In any event, no such bond should be required here because it is "proper for the court to require no bond where there has been no proof of likelihood of harm." *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996).  Here, no harm could exist where Grenada is merely being compelled to perform agreements into which it has voluntarily entered.  *See LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48, 60-61 (2d Cir. 2004) (noting that "it is undisputed that [defendant] is under a legal obligation to honor the Guaranty [and] [c]omplying with this obligation cannot constitute 'harm.'").  Moreover, were Grenada to suffer any financial harm as a result of an improperly issued injunction or restraint, the amount could be set off against the unsatisfied judgment.